**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW MEXICO**

**PACER Cover Sheet**
**for Electronically Filed Documents**

Any data shown here are current as of  06/10/06      . Any element of information on this form,
except the received date, is subject to change as changes may be made to the Court's official docket.

**Case Title:**     New Mexico Golf Academy, LLC

**Case Number:**    04-15974

| Document Information |
|---|

**Description:**    Memorandum Opinion re: [72-1] Motion To assume unexpired lease of
non-residential real property with Balloon Fiesta Park Golf Center by New Mexico
Golf Academy, LLC .

Received on:       2005-04-29 15:36:42.000

**Date Filed:**      2005-04-29 00:00:00.000

**Date Entered On**
**Docket:**          2005-05-02 00:00:00.000

| Filer Information |
|---|

**Submitted By:**    Patti Hennessy

| If this form is attached to the document identified above, it serves as an endorsed copy of the document as it existed on the above date.  To confirm that nothing has changed since then, review the docket. |
|---|

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:   NEW MEXICO GOLF ACADEMY, LLC,                    No. 11-04-15974 MA

Debtor.


### MEMORANDUM OPINION

THIS MATTER is before the Court on the New Mexico Golf Academy, LLC's Motion for

Approval of Assumption of Unexpired Lease of Non-Residential Real Property ("Motion to Assume

Lease"). New Mexico Golf Academy, LLC ("NMGA") seeks to assume a lease of certain non-

residential real property between NMGA, as lessee, and the City of Albuquerque, a New Mexico

municipal corporation ("City"), as lessor pursuant to 11 U.S.C. § 365. NMGA is represented by

George "Dave" Giddens, and the City is represented by Rebecca Wardlaw. The Court held a final

hearing on the Motion to Assume Lease and the Court took the matter under advisement. After

reviewing the evidence presented at the final hearing, considering the arguments of counsel, and being

otherwise sufficiently informed, the Court finds that NMGA should be allowed to assume the lease and

cure defaults under the lease within a reasonable time in accordance with 11 U.S.C. § 365, but that

certain matters must be referred to arbitration in accordance with the terms of the lease.

### BACKGROUND

As a result of the recommendation to award a contract to NMGA for its proposal submitted in

response to Request for Proposals Number RFP 99-026 SV, the City and NMGA entered into a

Lease and Agreement for Balloon Fiesta Park Golf Center ("Lease") in the fall of 1999 for the purpose

of developing and operating a golf center on part of the grounds owned by the City known as Balloon

Fiesta Park . *See* Exhibit 1. At that time the City was in the process of developing Balloon Fiesta Park to serve as the site of the annual Kodak Albuquerque International Balloon Fiesta Event. *See* Exhibit 1 - Lease. The Lease was supplemented and amended three times.[1] The Lease, as amended, contemplated that NMGA would enter into a sublease for the operation of a restaurant on the leased premises. NMGA and Tortilla, Inc. entered into a Lease ("Sublease") for the operation of a restaurant on the leased premises. Pursuant to the Lease, as amended, NMGA was obligated to pay the City additional rent as a result of the Sublease to Tortilla, Inc. as the food and beverage operator on the leased premises. Sometime after NMGA and the City entered into the Lease, the City developed certain portions of Balloon Fiesta Park adjacent to the portion leased to NMGA to be used as soccer playing fields. Disputes arose between NMGA and the City with regard to the Lease, including unpaid rents, maintenance and safety issues, use of the leased premises for special events, and unpaid water bills. On August 9, 2004, the City issued a notice of default detailing the alleged monetary and non-monetary defaults under the Lease. Exhibit 2. NMGA filed its voluntary petition under Chapter 11 of the bankruptcy code on August 16, 2004. The Lease is NMGA's primary asset.

DISCUSSION

Section 365 of the Bankruptcy Code governs assumption of unexpired leases. 11 U.S.C. §

-------------------

[1]*See* Exhibit 1 - First Supplement and Amendment to Lease Agreement for Balloon Fiesta Park Golf Center Between the City of Albuquerque and New Mexico Golf Academy, L.L.C. ("1st Amendment"), executed by the parties in August 2001; Second Amendment to Lease and Agreement for Balloon Fiesta Golf Center Between the City of Albuquerque and New Mexico Golf Academy, L.L.C. ("2nd Amendment"), executed by the parties on November 29, 2001; and Third Amendment to Lease and Agreement for Balloon Fiesta Park Golf Center Between the City of Albuquerque and New Mexico Golf Academy, L.L.C. ("3rd Amendment"), executed by the parties in November 2002.

365.  It allows a trustee or debtor-in-possession[2] to assume an unexpired lease of the debtor, provided

generally that, if there has been a default,  the default is promptly cured, the non-debtor party to the

unexpired lease is compensated for any pecuniary loss resulting from the default, and there is adequate

assurance of future performance under the lease.  11 U.S.C. § 365(b)(1).  A default may be monetary

in nature, such as a failure to pay rent, or non-monetary, such as a failure to perform certain

requirements under the lease.  This distinction between monetary and non-monetary defaults has

resulted in a split in authority over the interpretation of 11 U.S.C. § 365(b)(2)(D), which sets out an

exception to the general requirement to cure prescribed by 11 U.S.C. § 365(b)(1).  That section

provides:

> Paragraph (1) of this subsection [requiring the curing of defaults as a condition to
> assumption] does not apply to a default that is a breach of a provision relating to --
>
> > (D) the satisfaction of any penalty rate or provision relating to a
> > default arising from any failure by the debtor to perform
> > nonmonetary obligations under the executory contract or
> > unexpired lease.

11 U.S.C. § 365(b)(2)(D).

The Ninth Circuit has interpreted this section to mean that the word "penalty" modifies both "rate" and

"provision" such that monetary penalties arising from non-monetary defaults need not be cured.  *In re*

*Claremont Acquisition Corp., Inc.,* 113 F.3d 1029, 1034 (9th Cir. 1997) ("[S]ubsection (D)

provides an exception from cure for satisfaction of 'penalty rates' and 'penalty provisions.'").  Under

---

[2]A Chapter 11 debtor-in-possession is invested with the rights of a trustee pursuant to 11
U.S.C. § 1107(a).  NMGA, as debtor-in-possession, has the powers of a trustee to assume an
unexpired lease in accordance with 11 U.S.C. § 365.

3

this interpretation, only non-monetary defaults that have corresponding penalty rates or provisions are excepted from the cure requirements of 11 U.S.C. § 365(b)(1), resulting in a requirement to cure all non-monetary defaults for which there are no related penalty rates or penalty provisions. *See* William P. Weintraub, *Historical Defaults and Cross-Defaults: Here a Default, There a Default, Everywhere a Default, Default, Default,* 26 Ca.Bankr.J. 286, 292 (discussing the reasoning adopted by the Ninth Circuit in *Claremont*).

In *Claremont,* the debtors failed to operate their automobile dealerships for seven consecutive business days prior to the filing of their bankruptcy petition, constituting a nonmonetary default under the dealer franchise agreements the trustee sought to assume and assign. *Claremont,* 113 F.3d at 1033. Because this non-monetary default was an historical fact which could not be cured, and because the Ninth Circuit concluded that 11 U.S.C. § 365(b)(2)(D) does not relieve the debtor from the obligation to cure non-monetary defaults, the dealer agreements could not be assumed or assigned. *Id.* at 1033 and 1035.

In *In re Bankvest Capital Corp.,* 360 F.3d 291 (1ˢᵗ Cir. 2004), the First Circuit disagreed with the reasoning of *Claremont,* and interpreted 11 U.S.C. § 365(b)(2)(D) to permit assumption of an unexpired lease without first curing non-monetary defaults. The First Circuit rejected the Ninth Circuit's plain meaning approach to the language of 11 U.S.C. § 365(b)(2)(D), finding that the language of the statute is "awkward and ungrammatical." *Id.* at 297 n. 11. In concluding that the debtor need not cure a non-monetary default as a requisite to assumption, the First Circuit focused on "practical considerations of bankruptcy policy and Congress's overarching purposes in the Bankruptcy Code." *Id.* at 299. Noting that Congress' basic purpose in § 365 is "to promote 'the successful

4

rehabilitation of the business for the benefit of both the debtor and all its creditors'", the First Circuit reasoned that preventing the debtor from assuming a contract because of an inability to cure an historical, irremediable event, would undermine this basic precept. *Id.* at 300 (quoting *In re FBI Distribution Corp.,* 330 F.3d 36, 45 (1st Cir. 2003)). In reaching its conclusion, the First Circuit noted that prior to the 1994 amendments, the developments in bankruptcy court decisions "put Congress on notice of the problem of irremediable non-monetary defaults," so that "'Congress's intent in enacting [§ 365(b)(2)(D)] was to address . . . a situation . . . where the trustee cannot go back in time to undo an act or omission of the debtor . . .'" *Bankvest,* 360 F.3d at 300 and 302 (quoting 3 Collier on Bankruptcy, § 365.05[4] (15th ed. rev. 2003)).

As in *Claremont*, the parties in *Bankvest* did not dispute that the default was a nonmonetary default. *Bankvest*, 360 F.3d at 296. And since the default related to the debtor's failure to deliver certain equipment on time, the non-monetary default was arguably the type of historical default that is not easily cured.[3] The end result is that under *Bankvest*, contrary to *Claremont,* 11 U.S.C. § 365(d)(2)(D) does not preclude a debtor's assumption of an unexpired lease despite the existence of a pre-petition, incurable, non-monetary default.

This Court finds the approach taken in *Bankvest* more persuasive because it is consistent with the goals of rehabilitating financially distressed businesses through bankruptcy reorganization in order to "maximize the value of the estate for *all* creditors." *Bankvest,* 360 F.3d at 300. However, given the

---

[3] However, the First Circuit specifically noted that its ruling did not establish that the debtor's failure to deliver the last twenty items of equipment was an incurable default. *Bankvest,* 360 F.3d at 300, n.15.

5

general requirement to cure defaults contained in 11 U.S.C. § 365(a)[4], this Court finds that 11 U.S.C. § 365(b)(2)(D) does not create a blanket exception to cure all non-monetary defaults. Where a non-monetary default, though it may be historical, is ongoing, and is not irremediable, it must be cured as a condition to assumption. *Cf. In re G.P. Express Airlines, Inc.*, 200 B.R. 222, 234 (Bankr.D.Neb. 1996) (addressing creditor's argument that excusing nonmonetary defaults subjects the creditor to continued performance in the face of the debtor's ongoing nonmonetary defaults by stating that "[t]he fact that Debtor does not have to cure preassumption nonmonetary defaults does not mean that the Debtor is excused from performing its nonmonetary obligations after assumption. In order to assume the contracts, Debtor must provide adequate assurance that it can perform its nonmonetary obligations in the future."). This approach is consistent with the First Circuit's remark in *Bankvest* that the 1994 amendments to 11 U.S.C. § 365 were motivated by the problem of *irremediable* non-monetary defaults. *Bankvest*, 230 F.3d at 300-301. *See also,* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 328 Defaults Based on Nonmonetary Obligations (inserting the following language into subsection (b) of § 365 "other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired

_____

[4]*See In re Valley View Shopping Center, L.P.,* 260 B.R. 10, 25 (Bankr.D.Kan. 2001) ("'One of the purposes of Section 365 is to permit the debtor to continue in a beneficial contract provided, however, that the other party to the contract is made whole at the time of the debtor's assumption of the contract.'") (quoting *J.W. Mays,* 30 B.R. 769, 881-772 (Bankr.S.D.N.Y. 1983)). *See also, In re Entertainment, Inc.,* 223 B.R. 141, 150 (Bankr.N.D.Ill. 1998) (noting that "[o]nce the Lease was assumed . . . under § 365(b)(1), all contractual defaults thereunder must be cured by payments, and all contractual provisions enforced.").

6

lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption . . .").

The City bears the initial burden of showing the defaults under the Lease. *In re F.W. Restaurant Associates, Inc.*, 190 B.R. 143, 147 (Bankr.D.Conn.1995) (non-debtor lessor "bears evidentiary burden of establishing the Debtor's default . . ."); *Georgia Ports Authority v. Diamond Manufacturing Company, Inc. (In re Diamond Manufacturing Company, Inc.)*, 164 B.R. 189, 199 (Bankr.S.D.Ga.1994) (the lessor bears initial burden of showing the existence of defaults, and that the lessee has been put on notice of the defaults). The ultimate burden then rests upon the Debtor to show that it is able to promptly cure all existing defaults and provide adequate assurances of future performance. *F.W. Restaurant Associates, Inc.,* 190 B.R. at 147.

In view of these standards, the Court will consider in turn each of the City's alleged defaults as outlined in the August 9, 2004 default letter.

1. Failure to Pay Minimum Annual Guarantee Rents

Pursuant to Section 12 of the Lease, NMGA is obligated to pay to the City as rent the greater of a Minimal Annual Guarantee or a Percentage Rent applicable to gross revenues. *See* Lease, Section 12.A. For Contract Years 1 through 4, the Minimum Annual Guarantee is $15,000.00. Lease, Section 12.A.1. Beginning in Contract Year 5, the Minimum Annual Guarantee increases to $40,000.00.[5] *Id.* The Percentage Rent is three percent (3%) of gross revenues for Contract Years 1 through 10. Lease, Section 12.A.2. NMGA pays rent on a monthly basis based on the percentage

---

[5]The Minimum Annual Guarantee for years 5 - 25 of the Lease breaks down as follows:
    Years 5 - 9 = $40,000.00; Years 10 - 19 = $50,000.00; Years 20 - 25 = $60,000.00

7

rent on gross revenues from the previous month. Lease, Section 12.A.3.i. ("The Percentage Rent is due and payable, without notice or demand, within fifteen (15) days after the end of each month."). At the end of each Contract Year, if the sum of the monthly percentage rent payments is less than the required Minimum Annual Guarantee, NMGA is obligated to pay the difference within fifteen days. Lease, Section 12.A.3.ii. "Contract Year" as defined in the Lease is the "twelve month period commencing on the Operation Date . . . ." Lease, Section 2.N. "Operation Date" is defined as the "date the lessee [NMGA] opens for public use and commences to operate the Golf Center which shall occur no later than 330 days after the effective date . . . unless otherwise agreed to in writing . . . " Lease, Section 2.DD. The "effective date" is the date the lease is approved by the City Council or signed by the Chief Administrative officer, whichever is later. Lease, Section 51. The City Council approved the Lease on October 18, 1999, and the Chief Administrative Officer for the City signed the lease on November 19, 1999. Based on the execution dates, the effective date of the Lease is November 19, 1999. John Youngblood, one of the current managing members of NMGA, testified that the facility opened for business in April of 2001. A letter from Pleas Glenn, Director Parks and Recreation Department to Mr. Dale Scott at the New Mexico Golf Academy dated May 31, 2001 confirms that the Operation Date for the Lease is April 1, 2001. *See* Exhibit FF. Based on the foregoing, the Court finds that Contract Year 1 commenced April 1, 2001.[6]

     The default letter alleges a default in payment of the Minimum Annual Guarantee for Contract

---

[6]Contract Year 1 = April 1, 2001 through March 31, 2002
Contract Year 2 = April 1, 2002 through March 31, 2003
Contract Year 3 = April 1, 2003 through March 31, 2004
Contract Year 4 = April 1, 2004 through March 31, 2005

Years 1 and 2. The default letter also alleges a default based on an alleged failure to maintain adequate records in accordance with Section 12.D.6[7] of the Lease, estimated at $15,000.00 per year for two years. The City's default letter claims only the interest on the estimated $15,000.00 percentage rent, in the total amount of $5,400.00. This additional alleged default appears to duplicate the alleged failure to pay the Minimum Annual Guarantee because it appears to relate to Contract Years 1 and 2 and uses as its estimate $15,000.00, which is the equivalent of the Minimum Annual Guarantee for those years. In addition, the testimony of Amy Carter, the certified public accountant who assisted with the preparation of the "agreed upon procedures", supports the conclusion that this alleged default relates to Contract Years 1 and 2. She testified that she was not able to conduct a complete reconciliation of the gross revenues against the amounts paid to the City from the records supplied by NMGA until the year 2003. The City offered no other evidence in support of its alleged default for unpaid rent based on its computation for interest on estimated unpaid percentage rents for years the City alleges NMGA kept inadequate records.

In June of 2003, NMGA tendered payment of $24,670.00 to the City representing what NMGA believed was the outstanding amount due under the Lease for Contract Years 1 and 2, plus the additional rent due the City related to the Sublease. *See* Exhibit 13. At closing argument, the City

---

[7]Section 12.D.6. of the Lease provides:

> In the event Lessee fails to create and/or preserve part or all of the Gross Revenues records required in this Agreement, Lessee shall pay the City the Percentage Rent on an estimated amount of Gross Revenues for the time period for which such records were not created or preserved, plus eighteen percent (18%) thereon. The estimate of Gross Revenues shall be made by the City and shall be based on historical sales of Lessee or on the sales of other City golf courses. Failure to Lessee to create and/or preserve such records shall be a material breach of this Agreement by the Lessee.

9

conceded that it no longer claims unpaid rent for Contract Years 1 and 2 based on the Minimum Annual Guarantee. The Court, therefore, finds that there is no outstanding uncured default as of the petition date for unpaid rents based on the Minimum Annual Guarantee for Contract Years 1 or 2, including any alleged outstanding interest due on estimated percentage rents for those years based on the alleged failure to maintain records of gross revenue.

Contract Year 3 ended on March 31, 2004. There is insufficient evidence before the Court as to whether there remains any unpaid rent attributable to Contract Year 3 (i.e., whether there is a shortfall between the percentage rents paid during Contract Year 3 and the $15,000.00 Minimum Annual Guarantee), whether there is any unpaid percentage rent due from April 1, 2004 through the petition date, and whether any late charges are due for that period. Ms. Tammy Griego, a fiscal supervisor for the City, testified that she recalled seeing monthly payments from NMGA based on percentage revenues, but Exhibit PPP does not reflect receipt of monthly percentage rent payments.

Section 36.C. of the Lease provides that disputes under the Lease shall be settled through binding arbitration.[8] Because there is insufficient evidence for the Court to determine the amount of any outstanding rent due for Contract Year 3 through the petition date, the Court will direct the parties to arbitration in accordance with the Lease for the purposes of determining the amount, if any, due for that period.

---

[8]Section 36.C. provides, in relevant part:
> Any dispute concerning this Agreement, or the performance, interpretation, or breach hereof, shall be settled by arbitration pursuant to the Commercial Arbitration Rules ("Rules") of the AAA then in effect. . . . . The award of the arbitrator(s) shall be final and binding.

2. Failure to Pay Additional Rent based on Sublease with Tortilla, Inc.

The Lease, as amended, contemplated that NMGA would enter into a sublease for a restaurant facility. *See* 1st Amendment, 2nd Amendment and 3rd Amendment. Under the 1st Amendment, NMGA became obligated to pay the City $500.00 per month or 10% of the base rent due under any sublease, whichever is greater ("Additional Rent") in addition to the Minimum Annual Guaranty or the Percentage Rent due under the Lease. *See* 1st Amendment, ¶ 4. The obligation to pay the Additional Rent commenced "upon the *effective date* of any sublease . . . " 1st Amendment, ¶ 4 (emphasis added). The City claims a default for failure to pay the Additional Rent. The basis of this alleged default turns on the applicable effective date of the Sublease between NMGA and Tortilla, Inc.

NMGA, as lessor, and Tortilla, Inc., as lessee, entered into a Sublease for the restaurant and catering facility located on the leased premises. *See* Exhibit 3. While the first page of the Sublease recites that the Sublease is "effective this 27th day of February 2001 . . . ", Section XXXV of the Sublease recites that "[t]he [Sub]Lease shall be effective on the date the Lessor Executes the [Sub]Lease, but no later than seven (7) days after the date executed by Lessee." The NMGA, as lessor, executed the Sublease on May 29, 2002. There is no date reflected under the signature by Tortilla, Inc., the lessee.

The City takes the position that the effective date of the Sublease is February 27, 2001, obligating NMGA to pay the Additional Rent from that date forward in accordance with the 1st Amendment to the Lease. However, pursuant to the 1st Amendment, the terms and conditions of the

11

Sublease were subject to review and approval by the City. *See* First Supplement, ¶ 3.C.[9]   The City

did not consent to the Sublease until June 10, 2002. *See* Sublease, p. 26.

Based on the express language in the Sublease and the language in the 1st Amendment requiring

the City's approval, the effective date of the Sublease *vis a vis* the City would either be May 29, 2002

(the date the Lessor executed the Sublease) or June 10, 2002 (the date the City consented to the

Sublease), not February 27, 2001.   However, in addition to the Sublease, NMGA and Tortilla, Inc.

entered in to a Commitment to Pay pursuant to which NMGA and Tortilla, Inc. agreed that the

commencement date of the Sublease was January 1, 2002.   The City did not approve the Commitment

to Pay, and is  not bound by its terms.   But because NMGA consented to the earlier commencement

date specified in the Commitment to Pay, the Court finds that the applicable effective date of the

Sublease for purposes of determining the amount of any alleged default due the City based on a failure

to pay the Additional Rent is January 1, 2002.

Under the Lease, as amended, the obligation to pay Additional Rent commences on the

effective date of the Sublease, and is payable monthly "at the same time and place as rent is due and

payable under the [Lease] . . . " 1st Amendment,  ¶4.   Rents, including the Additional Rent,  are

payable within fifteen days after the end of each month.  Lease, Section 12.A.3; 1st Amendment, ¶ 4.

Any payment not received by the City when due is subject to interest at "one and one-half percent (1 ½

%)  per month (eighteen percent annually) for each month or partial month that any payment due is not

paid."  Lease, Section 12.B.   NMGA contends that because these late charges are imposed upon a

---

[9]The First Supplement provides further that any sublease with a food and beverage operator
"that has not been approved by the City . . . shall be a material default under the [Lease]."

default (i.e., the failure to timely pay the rent obligation when due), they constitute a "penalty rate" or "penalty provision" under 11 U.S.C. § 365(b)(2)(D) that NMGA is not required to cure as a condition to assumption. This Court disagrees.

The interest charge due on unpaid rents is an enforceable term of the Lease, as opposed to a penalty clause that provides for interest in excess of the contractual rate. *Cf. Valley View Shopping Center,* 260 B.R. at 25-26 (adjudicating confirmation of a Chapter 11 plan by enforcing provision in lease requiring debtor to pay 10% interest on unpaid rent, finding that ". . . pursuant to § 365(b)(1), the Debtor is required to make payment of interest at the contract rate on the prepetition unpaid rent installment."); *In re Entertainment, Inc.,* 223 B.R. 141, 150 (Bankr.N.D.Ill 1998) (concluding that interest on pre-petition lease charges had to be paid as a condition of assumption, since the interest rate of 18% was the contract rate on all monies owed by the lessee to the lessor after the due date); *In re Kyle Trucking, Inc.,* 239 B.R. 198, 202-203 (Bankr.N.D.Ind. 1999) (in determining the obligations of the trustee under 11 U.S.C. § 365(d)(10) to "perform all obligations of the debtor . . . until such lease is assumed or rejected . . . .", the court found that the lessor was entitled to recover late fees that accrued on account of unpaid rentals that came due after the 60 days following the order of relief). "A party who is forced under § 365 to continue the performance of a lease or other executory contract is entitled to and must receive the 'full benefit of the bargain.'" *Entertainment, Inc.,* 223 B.R. at 151.

NMGA paid the City $24,670.00 in June of 2003, of which $8,500.00 was intended as payment of Additional Rent due from January 1, 2002 through May 1, 2003. *See* Exhibit 13. The City's Exhibit NNN reflects that NMGA has paid the Additional Rent of $500.00 per month from May 1, 2003 through the petition date in August 2004, the last payment representing the payment due for

13

July 2004, but that some payments were not received by the fifteenth day of the following month as required under the Lease. Interest charges remain due for each payment that was not timely made, calculated as follows:[10]

| Payment/Amt Due | Due Date | Date Paid | Interest Due |
|---|---|---|---|
| January 2002 - $500.00 | February 15, 2002 | June 25, 2003 (part of $24,670.00 lump sum pmt to City) | 1.5% of $500 = $7.50 X 17 mos = $127.50 |
| February 2002 - $500.00 | March 15, 2002 | June 25, 2003 | $7.50 X 16 mos. = $120.00 |
| March 2002 - $500.00 | April 15, 2002 | June 25, 2003 | $7.50 X 15 mos. = $112.50 |
| April 2002 - $500.00 | March 15, 2002 | June 25, 2003 | $7.50 X 14 mos. = $105.00 |
| May 2002 - $500.00 | June 15, 2002 | June 25, 2003 | $7.50 X 13 mos. = $97.50 |
| June 2002 - $500.00 | July 15, 2002 | June 25, 2003 | $7.50 X 12 mos. = $90.00 |
| July 2002 - $500.00 | August 15, 2002 | June 25, 2003 | $7.50 X 11 mos. = $82.50 |
| August 2002 - $500.00 | September 15, 2002 | June 25, 2003 | $7.50 X 10 mos. = $75.00 |
| September 2002 - $500.00 | October 15, 2002 | June 25, 2003 | $7.50 X 9 mos. = $67.50 |
| October 2002 - $500.00 | November 15, 2002 | June 25, 2003 | $7.50 X 8 mos. = $60.00 |
| November 2002 - $500.00 | December 15, 2002 | June 25, 2003 | $7.50 X 7 mos. = $52.50 |
| December 2002 - $500.00 | January 15, 2003 | June 25, 2003 | $7.50 X 6 mos. = $45.00 |
| January 2003 - $500.00 | February 15, 2003 | June 25, 2003 | $7.50 X 5 mos. = $37.50 |
| February 2003 - $500.00 | March 15, 2003 | June 25, 2003 | $7.50 X 4 mos. = $30.00 |
| March 2003 - $500.00 | April 15, 2003 | June 25, 2003 | $7.50 X 3 mos. = $22.50 |
| April 2003 - $500.00 | May 15, 2003 | June 25, 2003 | $7.50 X 2 mos. = $15.00 |
| May 2003 - $500.00 | June 15, 2003 | June 25, 2003 (part of $24,670.00 pmt) | late fee = $7.50 |
| June 2003 - $500.00 | July 15, 2003 | July 23, 2003 | late fee = $7.50 |

[10]The lease calls for a late charge equal to 1.5% per month for "each month or partial month" that the payment is not made. In calculating the amount of the late charges, the Court will add a late fee equal to 1.5% of the rent due for each month or partial month the payment due remained unpaid. The express language of the Lease does not provide for compounded interest.

14

| | | | |
|---|---|---|---|
| July 2003 - $500.00 | August 15, 2003 | August 19, 2003 | late fee = $7.50 |
| August 2003 - $500.00 | September 15, 2003 | September 18, 2003 | late fee = $7.50 |
| September 2003 - $500.00 | October 15, 2003 | November 21, 2003 | late fee = $7.50 |
| October 2003 - $500.00 | November 15, 2003 | November 21, 2003 | late fee = $7.50 |
| November 2003 - $500.00 | December 15, 2003 | January 14, 2004 | $7.50 X 2 mos. = $15.00 |
| December 2003 - $500.00 | January 15, 2004 | January 14, 2004 | timely payment - no late charge |
| January 2004 - $500.00 | February 15, 2004 | February 17, 2004 | late fee = $7.50 |
| February 2004 - $500.00 | March 15, 2004 | March 16, 2004 | late fee = $7.50 |
| March 2004 - $500.00 | April 15, 2004 | April 16, 2004 | late fee = $7.50 |
| April 2004 - $500.00 | May 15, 2004 | May 16, 2004 | late fee = $7.50 |
| May 2004 - $500.00 | June 15, 2004 | May 14, 2004[11] | timely payment - no late charge |
| June 2004 - $500.00 | July 15, 2004 | July 14, 2004 | timely payment - no late charge |
| July 2004 - $500.00 | August 15, 2004 | August 16, 2004 | late fee = $7.50 |
| | | | **TOTAL ACCRUED INTEREST = $1,237.50** |
| | | | |

The failure to timely pay the Additional Rent is a monetary default under the Lease, subject to cure.

3. Failure to Pay Additional Rent for Special Events

During the course of the Lease, NMGA, and/or Tortilla, Inc. have held several events on the leased premises that are not golf-related, including Wine Fest events held in May of 2003 and May of 2004, and the Blarney Bash held in March of 2004. The City alleges that each special event held on the leased premises involving sales of food and alcoholic beverages constitutes a sublease with a food and beverage operator, subjecting NMGA to Additional Rent of $500.00 for each event. *See* Exhibit 2, ¶ 1(b)(i) - (iv). In addition, disputes arose between the City and NMGA over whether the City

---

[11]*See* Exhibit NNN reflecting that "Paid May 2004 on May 14, 2004."

15

could condition its approval of these special events on payment of a 50¢ per person user fee plus a 10% charge on alcohol sales.   Section 8.A. of the Lease, as amended, provides that the leased premises may be used for "the development and operation of the Golf Center which will be used as a golf course and other uses approved from time to time by the Director and for no other purposes." Third Amendment, Section B., amending Section 8.A.1.          Whether these special events constitute "subleases" is a matter best resolved through arbitration, as required by Section 36 of the Lease.  If it is determined through arbitration that the special events constitute subleases for which additional rent is due, the rent due shall be considered a monetary default subject to cure.

4.  Failure to Provide Audited Annual Reports

The City alleges that NMGA failed to provide an audited annual report for Contract Year 2, and that the report submitted for Contract Year 1 was inadequate, returned for additional documentation, and not resubmitted.  *See* Exhibit 2, ¶ 1)c).  Because the Court finds that there has been no default in payment of the Minimum Annual Guaranty for Contract Years 1 and 2, the Court will not require NMGA to cure this historical, non-monetary default as a condition of assumption. NMGA must comply with its ongoing obligation to furnish audited annual reports for subsequent Contract Years in accordance with the Lease terms, commencing with Contract Year 4.

5.  Payment of Costs Incidental to Independent Audit

The City asserts that NMGA is obligated to pay the costs in the amount of $7,740.19 associated with a report issued by the accounting firm of Neff & Ricci LLP.  The Lease obligates NMGA to pay for the costs of an audit conducted by a private certified public accountant if the results of the audit show an error in reported gross revenues in excess of five percent to the detriment of the

16

City.  *See* Lease, Section 12.D.3.  Otherwise, the City is to bear the cost of an audit.  *Id.*    The City

retained Neff & Ricci LLP to perform "agreed upon procedures."  *See* Exhibit X.  The report issued by

Neff & Ricci LLP based on the "agreed upon procedures" identified several items for which NMGA

was not in compliance under the Lease, including amounts due for Additional Rent, failure to maintain

sufficient inventory in the on-site pro shop, failure to pay outstanding utility bills for water usage, and

insufficient documentation to support capital improvement costs.  *See* Exhibit 9.  Neff & Ricci LLP also

reported that accounting records "from inception until July 2003 were not maintained properly," but

that from July 2003 through March of 2004 it reported "insignificant differences totaling $65.86" due to

the City based on the reconciliation of monthly reports to cash receipts.   The Neff & Ricci LLP report

was limited to the "agreed upon procedures" and did not constitute an audit.[12]   The City contends that

NMGA is required to pay the costs of the  "agreed upon procedures" because the "agreed upon

procedures" were preliminary to an audit, and that it elected not to conduct an audit because NMGA's

records were deficient.   Because Neff & Ricci LLP did not conduct an audit, and because the report

did not find a significant discrepancy in the reported gross revenues, the Court finds that the cost of the

"agreed upon procedures" is not attributable to NMGA under the terms of the Lease.  NMGA is,

therefore, not obligated to pay the cost of the "agreed upon procedures" in order to assume the Lease.

    6.  Failure to Maintain and Provide Adequate Records of Revenue and Revenue Sources

      The City alleges as a default that NMGA has failed to maintain adequate records of revenue

---

    [12]*See* Exhibit X, Agreement between the City and Neff & Ricci LLP to perform the agreed
upon procedures in accordance with the attached engagement letter which recites that "the procedures
included in the attachment to this letter do not constitute an audit made in accordance with generally
accepted auditing standards . . ."

17

and revenue sources. Amy Carter of Neff & Ricci, LLP testified that the records she was given were insufficient to complete a reconciliation of the revenues received as compared to the rents paid for Contract Years 1 and 2. However, John Youngblood testified that the City approached NMGA to change the reporting form on which NMGA supplied the City with monthly revenue reports, and that NMGA complied with that request. Mr. Youngblood also testified that he has three boxes of records from April 1, 2001 forward, organized by month, with sales receipts, and tapes as back up to the compiled attachments. Because NMGA changed the reporting forms to comply with the City's request, the Court finds that there is no continuing default, and that any historic failure to maintain and provide adequate records of revenue and revenue sources is an historic event that need not be remedied as a condition to cure.

    7. Failure to Erect 8' Perimeter Fencing

    The Lease incorporates by reference the Request for Proposals Number RFP 99-026 SV ("RFP"). Lease, Section 3. Pursuant to the RFP, the lessee is responsible for the design and installation of removable safety and security fencing around the golf driving range and the specialty golf area. RFP, .¶ 3.3.7. Specifically, the RFP requires an eight foot high fence around the perimeter of the driving range, but directs that "the Lessee shall determine if a higher fence is desirable." RFP, p. 10, ¶ 3.3.7. NMGA and the City had several discussions concerning the height and type of fencing to be installed on the perimeter, including a suggestion by the City that fencing much higher than eight feet be installed because of safety concerns for persons using the adjacent soccer fields. (Testimony of John King). Regardless of whether safety concerns suggest that the fencing ought to be higher than the eight foot fence called for in the RFP, the requirement in the RFP is clear. To be in compliance under the

18

Lease and the RFP, NMGA was required to install an eight foot, removable fence around the perimeter of the driving range and specialty golf center.  The perimeter fencing installed by NMGA is less than eight feet high and, therefore, does not meet the requirements of the RFP.   This deficiency constitutes an ongoing, remediable non-monetary default under the Lease.

John King, the division manager and head superintendent for the City's golf management division, testified that the fencing along the north boundary of the leased premises is adequate as it now is. While the City and NMGA can agree that a portion of the existing fence may remain, strict compliance with the Lease terms dictates that the perimeter fence be eight feet tall, and that a waiver of any requirement under the lease be made in writing, signed by the party making the waiver, and addressed to the other party.  *See* Lease, Section 37.2.  Therefore, this default must be cured, the Lease modified, or either party may raise this issue in the arbitration proceeding.

8.  Failure to Maintain $75,000.00 in Inventory

Section 14.F of the Lease requires NMGA to maintain inventory in the golf pro-shop of not less than $75,000.00.  NMGA has never maintained this level of inventory in its pro-shop, and is not in compliance with this requirement of the Lease.  Failure to maintain $75,000.00 in inventory at the golf pro-shop constitutes an ongoing default under the terms of the Lease requiring cure as a condition to assumption.

9.  Failure to Submit Required Plans

The City alleges that NMGA has failed to submit certain plans as required under the Lease, such as a Customer Service Plan, Personnel and Management Plan, Quality Control Plan, Marketing Plan and Financial Plan.  *See* Exhibit 2, ¶ 2)d).  Section 17.A of the Lease obligates NMGA to

19

maintain a Customer Services Plan, a Personnel and Management Plan for the Golf Center, a Quality

Control Program, and a Marketing Plan as required under the RFP. These plans are to be updated

every two years. *Id.* Section 17. B of the lease requires development of a Ten Year Financial Plan for

the Golf Center, which is to be updated and reviewed with the City annually. The failure to provide

these plans as required under the Lease is an historical, yet ongoing, non-monetary default which must

be cured as a condition to assumption.

     10. Failure to Pay Water/Utility Bills

     The biggest dispute between the parties concerns the issue of outstanding water utility bills.

The Lease provides that the City will pay all irrigation costs for Contract Year 1, and thereafter,

NMGA is obligated to pay the cost of re-use irrigation water which shall not exceed 25% of the City's

charge for potable water. Lease, Section 18.A. and B. NMGA has not paid the City any amount for

water usage. This constitutes a monetary default under the Lease that must be cured as a condition to

assumption. However, there is a dispute between the parties over the amount of credit NMGA

should be given against the outstanding bill.

     The facility NMGA constructed included an observation deck that the parties intended NMGA

would use during the Albuquerque International Balloon Fiesta (AIBF). The use of the deck would be

a revenue source for NMGA. Some time after the facility was constructed, the Federal Aviation

Administration ("FAA") objected to the use of the observation deck during the AIBF because of

safety concerns that balloons would be taking off too close to the facility. NMGA agreed not to use

the deck during the AIBF, but approached the City regarding a claim for lost revenue due to NMGA's

inability to use the deck during the AIBF. Several discussions ensued concerning a possible offset of

20

the lost revenues against the water bill, and a letter was prepared for signature by the City's then Chief Administrative Officer, Lawrence Rael, but this letter was never signed. *See* Exhibit 5. Nevertheless, correspondence and other documents from the City acknowledge that there is a dispute over this issue, and that NMGA may entitled to an offset for lost revenues against the unpaid water bill. *See, e.g.,* Exh 6 - Agenda for Meeting September 13, 2001, listing NMGA's request for compensation for lost revenues; Exh 7 - e-mail from Sandy Zuschlag regarding lost revenue amount City might offer NMGA. In addition, Amy Carter of Neff & Ricci, LLP testified that Ms. Zuschlag informed her that there was a dispute between the City and NMGA over the payment of the water utility bills, which was reflected in the draft of the "agreed upon procedures." *See* Exhibit 10. Sandy Zuschlag, special assistant to the City in charge of overseeing the design and operation of Balloon Fiesta Park, confirmed that there were many discussions between the City and NMGA over a possible credit or offset against water bills for the lost revenue to NMGA from its inability to use the observation deck during the AIBF. This dispute should be resolved through arbitration in accordance with Section 36 of the Lease, and the amount of any outstanding water bill must be paid as a condition to assumption of the Lease.

11.  General Maintenance and Safety Issues

Much evidence was presented at the final hearing concerning the condition and maintenance of the turf on the leased premises as compared to the turf maintained by the City on the adjacent soccer fields. NMGA currently has one full-time superintendent of maintenance on staff, Todd Lepisto. Mr. Lepisto testified that NMGA will likely hire one additional full time position, and that two full time persons can adequately care and maintain the golf course, including regular mowing, rotating the tees, taking care of top dressing, and other maintenance needs. He also testified that NMGA now has a

tractor with an aerator to address the compaction problems. NMGA has also begun a fertilizing program recommended by a consultant who markets and sells organic fertilizers to golf courses and parks and a program designed to alleviate compaction problems. Based on this evidence, the Court finds that NMGA has given adequate assurance that any maintenance problems are being adequately addressed. There is no ongoing default based on a failure to maintain the facility. Similarly, while NMGA has an ongoing obligation under the lease to maintain the leased premises in a safe condition, any safety issues which may have occurred in the past are historical events that do not constitute defaults requiring cure.

12.  Documentation of Capital Improvements Costs

The Lease, as amended, requires NMGA to make a capital investment of not less than $2,400,000.00 on the project. Lease, Section 19.D; 1st Amendment, ¶2. Section 19.D. of the Lease requires NMGA to provide the City a statement of the final costs of the project within thirty days of substantial completion of the construction and installation of the golf center project. Lease, Section 19.D. If the total expenditures to not meet or exceed the required capital investment, NMGA is obligated to pay the City the difference between the amount expended and the required capital investment. *Id.* There is no evidence before the Court that NMGA provided the City the statement of certified project costs as required under Section 19.D of the Lease.

The "agreed upon procedures" report issued by Neff & Ricci, LLP stated that NMGA was not able to provide "detail cost of the capital improvements" and concluded that NMGA was not in compliance with the capital investment requirements under the Lease. *See* Exhibit 9, Schedule A, ¶ 5. John Youngblood testified at the final hearing, that due to ongoing litigation between NMGA and AB

Construction, Inc. concerning the construction of the NMGA premises, the attorney handling that litigation had the documentation to support the capital investments.  Mr. Youngblood was not able to provide the documentation to Neff & Ricci LLP before Neff & Ricci issued its report.  The only evidence provided by NMGA of the expenditures for capital improvements is the 2003 Federal Depreciation Schedule for NMGA ("Depreciation Schedule").  Exhibit 11.  NMGA asserts that because the total depreciation reflected on the Depreciation Schedule is $2,946,751.00, NMGA has met its capital investment requirement.  Page one of the 2003 Federal Depreciation Schedule for NMGA reflects a cost/basis for total improvements in the amount of $1,061,089.00, page two lists a cost/basis for machinery and equipment in the amount of $96,816.00, and page three lists a cost/basis for a building and rental building in the total amount of $1,278,003.00.    Together these amounts exceed the required capital improvement investment amount.  While this evidence is not the equivalent of invoices for construction costs, the burden is on the City to show the existence of the alleged default. *F.W. Restaurant Associates, Inc.*, 190 B.R. at 147.  The City has not met this burden.  The Court, therefore, concludes that there has been no default under the Lease for failure to make sufficient capital improvements.

13. Failure to Obtain Prior Approval of Subleases for Special Events

The City's default letter included a separate alleged default for failure to obtain prior City approval for subleases and other rentals.  *See* Exhibit 2, ¶ 2)g).  Whether these special events constitute subleases will be resolved through arbitration in accordance with Section 36.C. of the Lease. Testimony at the final hearing regarding approval of these events indicated that approval has been obtained, but sometimes just prior to the event, and that there has been some animosity between

23

NMGA and the City over the approval process due to the City's policy of charging 50 cents per person plus 10% of alcohol sales, and the City's indication that approval of special events is conditioned on the inclusion of these charges. The City's policy was not in place at the inception of the Lease. Also, after the effective date of the Lease, a policy board authorized by City ordinance was organized to meets and give recommendations as to whether special events, including those sponsored by NMGA, should be held at Balloon Fiesta Park. NMGA is not a member of the policy board. Although Steve Wentworth, chairman of the policy board, testified that the policy board has not given its approval of all of NMGA's special events, and Sandy Zuschlag testified that she was not aware that the City gave its approval of the May 2003 Wine Fest, the Court finds that any alleged historical default for failure to obtain prior approval from the City for special events is a non-monetary default that need not be cured. However, whether prospective special events are subject to the City surcharges is an issue that should be resolved through arbitration in accordance with Section 36 of the Lease.

14. Failure to Post Required Bonds

The Lease requires NMGA to post the following bonds:

a) Construction, Performance and Payment Bonds

b) Fidelity bond in the amount of $25,000.00

c) Maintenance bond in the amount of $5,000.00

d) Performance Bond in an amount equal to 100% of the Contract Year Minimum Annual Guarantee, to be increased to match increases in the Minimum Annual Guarantee[13]

---

[13]The Minimum Annual Guarantee under Contract Year 5, beginning April 1, 2005, is $40,000.00.

Lease, Section 16.

The only bond offered into evidence was a Payment Bond executed by Gary Armstrong on behalf of

AB Construction. *See* Armstrong - Exhibit 3.   There is ongoing litigation between NMGA and AB

Construction concerning the construction of the facility.   Nevertheless, the facility has been constructed,

and the failure to post required construction, performance and/or payment bonds is an historical default

that need not be cured.  *Cf.  F.W. Restaurant,* 190 B.R. at 147, n.2 (finding that because the initial

capital expenditure requirement had been completed (which was the subject of the bond) the debtor

did not have to provide the performance and payment bond).   On the other hand, the requirement for

the posting of a fidelity bond, maintenance bond, and performance bond is an ongoing obligation under

the Lease.   NMGA's failure to post these bonds constitutes a default under the lease that must be cured

as a condition to assumption.

15.   Amendment to Conform Boundaries of Leasehold Interest to Actual Use

The premises occupied by NMGA does not conform to the boundaries defined by the Lease.

Though this issue has been discussed by the parties, NMGA and the City have not entered into an

amendment to the Lease to correct this discrepancy.   At closing argument, counsel for the City

indicated that the City has withdrawn its offer to redraw the boundaries to conform to the premises now

occupied by NMGA.   This is another issue which the Court finds can best be resolved through

arbitration in accordance with Section 36 of the Lease.

16.   Alarm Costs and $500 clean up fee for July 4

Exhibit RRR is an Alarm Registration History for the leased premises, reflecting an outstanding

invoice in the amount of $1,600.00.   Exhibit JJJ is a letter dated July 30, 2004 from the City to NMGA

25

reciting that NMGA agreed to pay the City $500.00 to remove sod, excess dirt, old fencing material and other debris from the leased premises. The City claims that these amounts remain unpaid, and constitute further defaults under the Lease. These amounts were not identified in the City's default letter dated August 9, 2004, and while they may be sums outstanding to the City there are not covered by the Lease and they should be treated as general unsecured claims of the City in the pending Chapter 11 proceeding.

In calculating the amount of any monetary default under the Lease, NMGA asserts that certain fees it expended in facilitating the issuance of a liquor license for Tortilla, Inc. should be credited against the total amount due. There is nothing in the Lease which speaks to this, and, although NMGA is to be commended for assisting the City in this fashion, its primary purpose was to expedite the sublease to Tortilla, Inc. This amount is not subject to offset or reimbursement.

Having determined the existence of monetary and non-monetary defaults which must be cured as a condition of assumption, the Court must consider whether the Debtor has offered sufficient evidence that it can cure, or promptly cure, the defaults and provide adequate assurance of future performance. 11 U.S.C. § 365(a). "Adequate assurance" should be given "pragmatic construction" focusing primarily on the ability to meet the financial obligations under the lease. *In re Martin Paint Stores,* 199 B.R. 258, 263 (Bankr.S.D.N.Y. 1996), *aff'd,* 207 B.R. 57 (S.D.N.Y. 1997). Two principals of the Debtor, John Youngblood and I.B. Hoover, each testified that they are willing and able to infuse whatever additional monies are required to allow the Debtor to assume the Lease and move forward with the Debtor's plans to formulate a liquidating plan of reorganization and sell its interest in the Lease. As proof of their ability to pay, the Debtor points to the fact that these principals have

26

historically been servicing the debt to New Mexico Bank & Trust and making the undisputed payments due to the City under the Lease over the past three years. Given that the purpose of assuming the Lease is to maximize value for an intended sale of the Debtor's assets within a relatively short period of time, the Court finds that the testimony of these two principals is sufficient to comply with the requirements of 11 U.S.C. § 365(a)(1).

Based on the foregoing, the Court concludes that the Debtor may assume the Lease in accordance with 11 U.S.C. § 365. The Lease is NMGA's primary asset. Even though the Debtor is likely to propose a liquidating plan, the Lease is vital to maximize the value of a sale of the Debtor's interests for the benefit of all creditors. The principals of the Debtor have provided adequate assurance that they will be able to cure the defaults promptly and perform in the future. The Court has identified several monetary and non-monetary defaults that must be cured as a condition to assumption, some of which will require arbitration. The cure period provided in the Lease is either fifteen days or thirty days, depending upon the type of default.[14] Section 365's requirement to "promptly cure" "depends upon the facts or circumstances of each case." *Valley View Shopping Center,* 260 B.R. at 26 (citing *In re Embers 86th Street, Inc.,* 184 B.R. 892, 900 (Bankr.S.D.N.Y. 1995)). In view of the cure periods provided in the Lease, the ongoing history between the City and NMGA, and the underlying bankruptcy policies for allowing debtors to assume unexpired leases, the Court finds that 60 days is a

---

[14]Section 33.A of the Lease provides for a 15 day cure period for the following events of default: 1) failure to pay rent and fees under Section 12; 2) failure to provide and maintain insurance under Section 15; 3) failure to provide and maintain required bonds under Section 16; failure to provide reports under Section 12.E; and 4) failure to pay the amounts due under the loan contemplated by Section 21. All other defaults under the Lease have a 30 day cure period. Lease, Section 33.B.

27

reasonable cure period for all non-monetary defaults, and that 120 days is a reasonable cure period for all monetary defaults. For items resolved through arbitration, the cure period shall run from the date the arbiter issues a decision.

An appropriate order consistent with this Memorandum Opinion will be entered.

_____
MARK B. McFEELEY
United States Bankruptcy Judge

I certify that on the date shown on the attached document verification, a true and correct copy of the foregoing was either electronically transmitted, faxed, delivered or mailed to the listed counsel and/or parties.

George "Dave" Giddens, Jr.
Attorney for Debtor
10400 Academy Rd NE Ste 350
Albuquerque, NM 87111 -1229

Rebecca E. Wardlaw
Attorney for the City of Albuquerque
PO Box 2248
Albuquerque, NM 87103 -2248

Robert H. Jacobvitz
Attorney for New Mexico Bank & Trust
500 Marquette NW Ste 650
Albuquerque, NM 87102 -5309

Tom Grisham
Attorney for AB Construction
 600 Central SW Ste 100
Albuquerque, NM 87102 -3176

_____
Patti G. Hennessy
Law Clerk
(505) 348-2545